546 . . ALABAMA.

The State, ex rel. Ellerbe, in re Daniel.

THE STATE, ex rel. ELLERBE, in re DANIEL.

[CERTIORARI TO REVISE PROCEEDINGS UNDER HABEAS CORPUS.]

1. *Construction of acts approved October 7th, and December 8th, 1864, as to employment of county reserves, or first-class militia.*—Under the proviso to the 7th section of the act approved October 7, 1864, entitled " An act to aid in arresting deserters and stragglers from the army," and the act amendatory thereof, approved December 8th, 1864, which declares, that nothing in the former act "shall warrant the employment of the county reserves, or first-class militia, as a *regular and permanent guard* for Federal prisoners, at any of the Confederate prisons in the State,"—the employment of the county reserves, by order of the governor, in guarding Federal prisoners, for a continuous term of *three months*, is not a violation of the law, such as will justify the interposition of the courts to discharge them on *habeas corpus.*

2. *Construction of 8th section of said act of October 7th, prohibiting " appointment of Confederate States army officers to command county reserves."* The clause in the 6th section of said act of October 7th, 1864, which provides that "nothing in this act shall be so construed as to authorize the appointment of Confederate States army officers to the command of such reserve force," simply requires that the county reserves, when tendered to the president for service in the capacities authorized by that act, should be commanded by officers who were elected or appointed in the manner prescribed by the acts of the legislature, and does not inhibit the placing of their respective company organizations under the control of the necessary officers of the Confederate States army ; nor can a member of such company obtain, under *habeas corpus*, a discharge from the legal custody of his captain, on the ground that the company was illegally placed under the command of a superior officer.

In the matter of the petition of Nathan Daniel for the writ of *habeas corpus*, by which he sought to procure his discharge from the custody of Capt. A. M. Ellerbe, who held him as a member of his company of county reserves, doing provost-guard duty at Cahaba. The petition was sworn to on the 30th December, 1864; and the hearing was had, on the 2d January, 1865, before the probate judge of Dallas county, who held the petitioner entitled to his discharge. Application was thereupon made to this court, in the name of the State, on the relation of Capt. Ellerbe, for

JANUARY TERM, 1865. 547

The State, ex rel. Ellerbe, in re Daniel.

the writ of *certiorari*, or such other remedial process as might be necessary, to revise the decision of the probate judge. By agreement of record between the counsel for the State and the petitioner, the issue of a *certiorari* or other writ was dispensed with ; and it was further agreed that the court should, on an inspection of a certified copy of the proceedings had before the probate judge, which was admitted to be correct, render such judgment as the probate judge ought to have rendered.

GEO. W. GAYLE, for the State.

A. J. WALKER, C. J.—The seventh section of the act of 7th October, 1864, entitled "An act to aid in arresting deserters and stragglers from the army," is in the words following : "The first-class militia shall not be called out, or used, in any case, except to repel invasion, enforce the conscription laws, suppress insurrections, arrest deserters or stragglers, enforce the laws in their respective counties, and do patrol duty as prescribed by this act, and other services as herein provided for : *Provided, that the governor may cause any portion of the militia of the first class, or all of them, in their respective counties, to be used to guard, keep, and transfer prisoners, captured either by the forces or authorities of this State, or of the Confederate States, but shall not order them out of their counties."* An act to amend the above-named law, adopted December 8th, 1864, provides, that nothing in the law of 7th October, 1864, "*shall warrant the employment of the county reserves, or first-class militia, as a regular and permanent guard for Federal prisoners, at any of the Confederate prisons in the State."* The last clause in the sixth section of the act of 7th October, 1864, is in the words following : "Nothing in this act shall be so construed as to authorize the appointment of Confederate States army officers to the command of such reserve force."

The discharge of the petitioner in this case, who belongs to the county reserves, is placed upon two grounds. The first is, that the petitioner is employed as a "regular and permanent guard for Federal prisoners," in contravention of the act of 8th December, 1864. The second is, that a

Confederate States army officer has been placed in command of him, in contravention of the last clause of the sixth section of the act of 7th October, 1864. These grounds we shall consider in the order of their mention.

From the 3d October, under the order of the governor of the State, each of the different companies of county reserves of Dallas county had, up to the suing out of the writ of *habeas corpus* in this case, with the exception of two weeks, served in succession tours of duty of two weeks in guarding the prisoners of war at Cahaba; and in their regular turns the companies were still serving in that capacity. The petitioner had been on duty for about four days, when he applied for the writ. The argument in support of the judgment of the court below is, that the facts above stated, of themselves, prove an employment of the county reserves "as a regular and permanent guard for Federal prisoners" at a Confederate prison, in violation of the act of 8th December, 1864.

To render the employment illegal, it must be both regular and permanent. Without scrutinizing the import of the word *regular*, we pass on to the inquiry, whether the facts stated prove the employment to have been permanent. We have here an instance, in which an indeterminate expression has been used by the legislature. It is difficult, if not impossible, to define the precise meaning of the word, as it occurs in the law. It certainly imports a lasting, fixed employment,—one not temporary or transitory. But, when does such an employment cease to be temporary, and become permanent? Is an employment for three months necessarily a *permanent* employment? We think not. It is conceivable that, in some exigency of public affairs, the county reserves might be employed during the exigency, even though it lasted longer than three months, and yet not be properly said to be permanently employed. The expression is relative in its character. The same period would stamp one subject with the character of permanency, while in reference to other subjects it would impart what would be denominated a transitory or fleeting character. Human life is said to be *fleeting;* while the country in which one has his domicile is called his *permanent* home. The State

government has not imposed upon its reserves the entire duty of guarding prisoners : but for intervals, for periods when it is demanded by the necessities of the times, the executive is authorized to assign them to that duty. Much, of course, must be left to the executive judgment and discretion, in the ascertainment of the length of service which shall be required. We shall not attempt to define what duration of service will render the employment permanent. It is sufficient for this case to hold, as we do, that a service for three months is not necessarily a permanent employment. We can not presume, in the absence of a manifest intention to do so, that the governor intends to act illegally, and impose the guarding of prisoners as a permanent duty on the reserves.

[2.] Nothing in the act is to be construed so as to authorize the appointment of Confederate States officers to the command of such reserve force. It must be observed, that this is not an inhibition of the command of the reserves by Confederate army officers. We presume it was not intended that the reserves, when called out to repel invasions, should be free from the operation of the orders issued by the general, or other superior officer, to whom the duty of repelling such invasion might be assigned, if the governor should, for the sake of co-operation and concert of action and greater efficiency, place them under the guidance of such orders. It is a mere rule for the construction of the act. It excludes such a construction of any of its provisions, as would authorize the appointment of Confederate officers to command them. The second and fifth sections authorize the governor to make appointments. The clause under consideration may be understood, if it should be at all material, as prohibiting him from the appointment of Confederate officers under either of those sections.

But we apprehend that the legislature, in the adoption of that clause, had in view the first section, which empowers the governor to tender the reserves to the president, to act as a provost-guard ; and also to the part of the seventh section which empowers the governor to cause them to be used to guard, keep, and transfer prisoners, within their counties. When they are tendered for service as a provost-

guard, or caused to guard, keep, or transfer prisoners, the sections under which those things are done are not to be construed to authorize the appointment of Confederate States officers to the command ; by which we understand, that they are to be commanded by officers elected or appointed in the manner designated in the acts of the legislature, and that they are to go into the services designated with the officers provided for in the law. But we do not understand it to mean, that when they enter upon the duty of serving the Confederate States, in any of the modes mentioned in the law, the organizations to which they belong must be free from the control of that government, exercised through its proper officers. The legislature could not have intended to make it the duty of the reserves to guard prisoners for the Confederate government, only upon the condition that it would yield the entire control of the prison to such reserves.

The complaint of the petitioner is not, that he is not under the command of an officer appointed or elected according to the State statute ; but that he, together with the whole company organization, is under the command of the commandant of the post, who, we infer, has charge of the prison, and to whom the companies are ordered to report. We can not suppose that the legislature contemplated a surrender by the Confederate government of the control of the prison to the reserves. Unless the control is thus surrendered, the reserves guarding the prison must, of necessity, be under the control of the Confederate authorities, so far as the government and direction of their duties is concerned. It is not alleged that the petitioner is detained by a Confederate officer. He is detained by his immediate captain, an officer of the State. The Confederate officer is neither alleged nor proved to have exercised any other command or authority over him or his company, than such as is necessary to preserve the authority of the Confederate government over the prison. Under these circumstances, we do not think that the petitioner is entitled to a discharge upon the second ground.

The petitioner does not deny that he is under the immediate command of an officer of the State reserves, author-

ized and legally qualified to command him. We have decided that the service in which he is employed is one allowed by the statute. He is detained by the State officer, and not by a Confederate officer. The complaint is, that the organization to which he belongs, is subjected to the command of a Confederate officer, in violation of the statute. If we concede that a Confederate officer improperly gives orders to the company, it does not therefore follow that the petitioner is entitled to a discharge under a writ of *habeas corpus*. Indeed, it is plain that he is not entitled to such discharge. His detention is legal and rightful, and by an officer having a right to detain him. The courts have no right to discharge a man whose detention is thus lawful and rightful. Their province is to relieve from unlawful imprisonment. It was, therefore, improper for the probate judge to take the petitioner out of the custody of Captain Ellerbe, who is alleged to detain him, and admits it in his return. If there was any thing illegal in requiring the company of Capt. Ellerbe to report to Col. Jones, a Confederate officer, and submit to his command, there is, no doubt, a remedy; but it is not found in an application to the courts for a discharge under the writ of *habeas corpus*. A soldier can not be entitled to a discharge from a legal service, because an officer unlawfully takes command of him, or because he is required to report to an officer having no authority over him.

Judgment and proceedings of the probate court reversed, annulled, and quashed.